# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-CR-272-JEB** |
| **v.** | : | |
| | : | |
| **MATTHEW MATULICH,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Matthew Matulich to three months' incarceration, one year of supervised release, 60 hours of community service, and consistent with the plea agreement in this case, $500 in restitution.

### I.      Introduction

Defendant Matthew Matulich, a 34-year-old laborer from Louisiana, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Matulich pleaded guilty to Theft of Government Property, in violation of 18 U.S.C. § 641. The government's recommendation is supported in this case because Matulich: (1) was one of the first rioters inside the Capitol through the Senate Wing Door, a mere two minutes after its initial breach; (2) entered the building despite shards of glass scattered on the ground outside the Senate Wing Door and a blaring alarm coming from inside the building; (3) removed a Kentucky state flag on a flagpole from its base in a Senate corridor; (4) stole government property, specifically an American flag on a flagpole that he later took home with him to Louisiana; (6) entered into the symbolically significant space of the Senate Gallery without authorization, while yelling "where the f-- are they?"; (7) remained inside the Capitol Building for approximately 40 minutes; and (8) remained on Capitol grounds for over three hours altogether.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Matulich's crime support a sentence of three months' imprisonment and one year of supervised release.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 19 (Statement of Offense) at ¶¶ 1-7.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Matulich's Role in the January 6, 2021 Attack on the Capitol*

Prior to January 6, 2021, Matulich followed news about claims of election interference in the 2020 presidential election. When an acquaintance asked if Matulich wanted to go with him to Washington, D.C. for the rally, Matulich agreed, and the two drove together from Louisiana to Northern Virginia, where they spent the evening of January 5 at an Airbnb residence. They then attended the "Stop the Steal" rally together on January 6, after which the pair split up. Matulich continued to the Capitol, where he gathered with a large crowd and saw tear gas canisters being launched, rioters climbing scaffolding, and flash bangs going off.

At approximately 2:13 pm., rioters broke windows next to the Senate Wing Door and entered the Capitol building, then broke open the door from the inside. Matulich entered the building through that door just two minutes later, at 2:15 p.m., as part of the first wave of rioters in the building. As Matulich was entering the building, he could observe broken glass and an alarm blaring throughout the building, as evidenced by third-party recordings contemporaneous to his entrance, *see* Ex. 1,[2] but he nevertheless continued forward.



*Figure 1: Matulich (circled in red) entering the Senate Wing Door at 2:15 p.m.*

---

[2] The government's video exhibits to this memorandum are submitted herewith by USAfx.

By approximately 2:28 p.m., Matulich had advanced with the crowd to the opposite end of the building, in the Hall of Columns, located beneath the House Chamber on the basement floor. Closed-circuit television ("CCTV") footage from that location shows Matulich approaching a group of police officers standing inside an exit to the building, at the front of a large mass of rioters. *See* Ex. 2. As the group of police officers walked backward while the crowd pressed forward, Matulich put his hands up in the air, but continued walking directly toward officers, forcing them back. The crowd movement slowed as many rioters turned around in order to remain inside the building. Matulich stopped and reached out his hand to shake hands with one of the officers, drawing him in for a hug. Matulich and the officer spoke briefly, then Matulich turned around and continued down the Hall of Columns deeper into the building.



*Figure 2: Matulich at the front of a crowd of rioters approaching officers in the Hall of Columns; screenshot of Ex. 2 at 2:09.*

From there, Matulich progressed up a flight of stairs. At approximately 2:31 p.m., CCTV footage captured Matulich in a corridor on the House of Representatives side of the first floor of the Capitol building. Together with other rioters, Matulich approached a table set up in a corridor

with boxes of what appeared to be chocolate cupcakes, took some for himself, and appeared to pass them around to other rioters. *See* Ex. 3.



*Figure 3: Matulich stealing cupcakes from a House-side corridor; screenshot of Ex. 3 at 0:51.*

Matulich continued deeper into the building, crossing over again to the Senate side of the building and making his way to the second floor. At approximately 2:37 p.m., Matulich entered a Senate corridor near a doorway that was flanked by American and Kentucky flags. Shortly before Matulich entered the corridor, another rioter removed the American flag from its base and walked away with it. Matulich removed the Kentucky flag from its base and walked with the flagpole in the same direction, before turning around and continuing deeper down the corridor, stopping to attempt to open office doors along the hallway. *See* Ex. 4.



*Figure 4: Matulich removing a Kentucky flag; screenshot of Ex. 4 at 1:31.*

At approximately 2:42 p.m., CCTV footage captured Matulich carrying the American flag that the other rioter had removed from its stand down another Senate corridor.



*Figure 5: Matulich carrying the stolen American flag through a Senate corridor.*

By approximately 2:51 p.m., Matulich had made his way to a hallway outside the Senate gallery, where he stopped to speak with other rioters.



*Figure 6: Matulich speaking with other rioters in a corridor outside the Senate gallery entrance*

Matulich proceeded to the entrance to the highly sensitive space of the Senate Gallery. Open-source video captured Matulich approaching the door and asking, "Is this the Senate?" Ex. 5 at 3:52. Peering inside the doorway and seeing the Senate floor empty, Matulich turned toward other rioters behind him and shouted, "Where the f-- are they?" *Id.* at 4:00. Matulich then entered the Senate Gallery, where he proceeded to raise his stolen American flag up in front of him and wave it in the air, while other rioters accessed the Senate floor.



*Figure 7: Matulich waving the stolen American flag in the Senate gallery.*

Matulich exited the building shortly thereafter, but remained on Capitol grounds until approximately 5:30 p.m. that evening, parading the stolen flag around the East Front of the Capitol.



*Figure 8: Matulich on Capitol grounds with the stolen American flag.*

*Matulich's Post-Arrest Interview*

On April 25, 2024, Matulich gave a voluntary post-arrest interview to the FBI. During the interview, he stated that he felt compelled to attend the "Stop the Steal" rally on January 6 because of what he heard on various podcast, including "Tore Says," a conservative podcast whose host, Tore Maras, is associated with the QAnon ideology. When an acquaintance offered him the opportunity to travel together to the rally, he agreed to go because he felt it would be a "once in a lifetime" event.

Matulich told agents that he and his travel companion attended the rally together, but split up later in the day. Matulich said that when he heard President Trump's remarks to the crowd that they were "all going to the Capitol," he felt an air of excitement. As he proceeded from the rally toward the courthouse, he saw the crowd stop in front of the courthouse along the way and chant "Do your job! Do your job!"

Matulich admitted that once he was on Capitol grounds, he saw tear gas canisters being launched and people climbing scaffolding, and he was surprised to hear flash bangs going off. He told agents that after hearing the flash bangs, he wanted to see what the crowd was doing to warrant that use of force from the police, but as he got closer to the Capitol, he passed "the point of no return" due the crowd size and people behind him pushing forward into the building.

Matulich told agents that while he was in the Capitol, he asked some police officers to take off their face masks so the crowd could see their facial expressions, claiming that this was a way to prevent confusion between police and rioters. Matulich also told agents he was trying to keep protesters from interfering with the police inside, and claimed he pulled one rioter back from engaging with a police line.[3]

---

[3] The government has no independent information to support this claim.

When asked about the American flag he had stolen, Matulich told agents he still had it, and gave them directions to locate the flag in his room, under his dresser. Matulich told agents that he knew he should not have taken the flag, but he stated that he wanted to have something to "remember the moment." He also described taking the flag as a way of "repatriating" or "rescuing" the flag. Matulich stated that he regretted taking the flag, but also said that by taking it, he could give it another purpose. When shown Figure 7, *supra*, depicting Matulich waving the flag in the Senate Gallery, Matulich called the photograph "cool" and noted that he had it seen shared on multiple national news outlets.[4]

*The Charges and Plea Agreement*

On June 4, 2024, the United States charged Matulich by a one-count Information with violating 18 U.S.C. § 641 pursuant to a plea agreement. On June 13, 2024, pursuant to that agreement, Matulich pleaded guilty to the information. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Matulich now faces a sentencing for violating 18 U.S.C. § 641. As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

---

[4] Matulich incorrectly described the location of this image during his interview as the Rotunda.

(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.*

The government agrees with the Sentencing Guidelines calculation set forth in the PSR:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 35-42. Matulich's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

*U.S.S.G. § 4C1.1 Adjustment for Certain Zero-Point Offenders*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the Government concedes that § 4C1.1 applies to Matulich, the Court should vary upward by two levels to account for the reduction under § 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside

is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Matulich's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the § 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

*Guidelines Range*

The U.S. Probation Office calculated Matulich's criminal history as Category I. PSR at ¶ 47. Accordingly, the U.S. Probation Office calculated Matulich's total adjusted offense level,

after acceptance of responsibility and the two-level reduction pursuant to U.S.S.G. § 4C1.1, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶ 98.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the § 3553(a) factors weigh in favor of the government's proposed 3-month sentence of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Matulich's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Matulich, the absence of violent or destructive acts is not a mitigating factor. Had Matulich engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in the duration and timing of Matulich's presence inside the Capitol Building. Notably, Matulich was among the very first group of rioters in the building, entering through the Senate Wing Door at approximately 2:15 p.m., just two minutes after the door was breached and the first rioters gained access. In order to gain entry to the Capitol at that early time, Matulich would have crossed over broken down barricades and passed by bike racks that were intended to prohibit entry into the restricted Capitol grounds. On the West Front of the Capitol, he would have witnessed individuals climbing on scaffolding and on the media tower, and he would have seen individuals confronting police officers. It would have been clear to Matulich that police lines had been penetrated and that rioters had caused property damage. Despite these numerous warning signs, Matulich joined a crowd that advanced toward the Capitol building and made entry through a non-public entrance with shattered glass surrounding it, while alarms blared.

While inside the Capitol and over the course of approximately 40 minutes, Matulich made his way through corridors on multiple floors of the building, on both the House and Senate sides. He treated the building and its contents like his own property, helping himself to a box of cupcakes that he passed among his fellow rioters, removing a Kentucky flag from its stand so rioters could march with it, and ultimately picking up and keeping an American flag on a flagpole. Matulich appeared to be looking for lawmakers, attempting to open doors in corridors, and shouting "Where the f—are they?" when he found the Senate floor unoccupied. He then entered the very sensitive area of the Senate Gallery and celebrated being there by waving the stolen American flag high above his head, in an image he later described to FBI agents as "cool." Matulich stayed on Capitol grounds with the stolen flag until approximately 5:30 p.m. that evening—over three hours after he first entered the building.

These actions demonstrate blatant disrespect for the law, and thus the nature and circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Matulich's History and Characteristics

As set forth in the PSR, Matulich has no criminal history. PSR ¶¶ 45-51. Matulich grew up in rural Louisiana until Hurricane Katrina struck the area while he was in high school, forcing him and has family to relocate to Alabama. After finishing college in Alabama and spending a short time thereafter residing in Florida, Matulich returned home to Louisiana, where he currently lives with his parents and helps with property maintenance. At the time of his arrest, Matulich was working as a dispatcher for the Associated Branch Pilots in Metairie, Louisiana; he was fired after his arrest. He began working as a laborer for Gemma Power Systems in June 2024.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a meaningful term of incarceration. Matulich's conduct on January 6 involved a *series* of poor decisions: He traversed several locations within the Capitol building and remained on the grounds into the evening hours; he stole government property; he waived a stolen flag in one of the most sensitive areas of the Capitol building, the Senate Chamber; and most troubling of all, he appeared to be looking for lawmakers, attempting to open doors and shouting "Where the f—are they?" when he found the Senate floor unoccupied.

Matulich continues to minimize the seriousness of his actions on January 6. Even after his arrest, when Matulich was shown a photograph of himself waving the flag he stolen from the Capitol, he described the image as "cool." This expression of pride in his shameful actions raises significant concerns about Matulich's willingness to engage in similar conduct again in the future.

In his post-arrest interview, Matulich repeatedly minimized his participation in the riot. Specifically, Matulich stated that although he knew he should not have taken the flag, he wanted something "to remember the moment" and described his theft as a way of repatriating or rescuing the flag. He also repeatedly tried to cast himself in a heroic light, suggesting that he had tried to protect police from other rioters. Matulich's failure to appreciate the wrongfulness of his actions warrants a meaningful sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[5] This Court must sentence Matulich based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Matulich has pleaded guilty to Count One of the Information, charging hm with misdemeanor Theft of Government Property (less than $1,000), in violation of 18 U.S.C. § 641. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. William Merry*, 21-cr-748-JEB, Merry pled guilty to one misdemeanor count of 18 U.S.C. § 641. Similar to Matulich, Merry also saw and heard numerous warning signs that should have discouraged him from entering the Capitol building (e.g., rioters pushing barricades, glass on the ground, and an alarm blaring from the building); he entered the Senate Wing Door shortly after its initial breach (around 2:20 p.m.); he entered a sensitive area of the Capitol building (Speaker's suite); he stole government property (a shard of Speaker Pelosi's office sign that had been broken off the wall); and he spent a significant amount of time in the Capitol building (nearly 40 minutes). Merry arguably had some aggravating factors that Matulich did not: Merry gave an interview on Capitol grounds in which he appeared to be proud of storming the Capitol. However, distinct from Matulich, Merry did not steal the government property himself (he encouraged his family member to do it), and Matulich entered the highly symbolic Senate Gallery and waved the stolen flag there. This Court sentenced Merry to 45 days' imprisonment, 9 months' supervised release, and 80 hours of community service.

In *United States v. John Riddle*, 21-cr-304-DLF, Riddle pled guilty to one misdemeanor count of 18 U.S.C. § 641 and one count of 40 U.S.C. § 5104(e)(2)(G). Similar to Matulich, Riddle entered the Capitol building from the chaotic West side (using the Northwest Senate doors, also known as the Parliamentarian's doors); he entered a sensitive area in the Capitol Building (the Senate Parliamentarian's office); and he stole from the Capitol building, including government property (a bottle of wine from the Senate Parliamentarian's Office which he drank, and the Parliamentarian's Senate Procedure book, which he sold outside the Capitol building for $40).

Riddle also had additional aggravating factors not present for Matulich: Riddle gave interviews after the riot showing lack of remorse and deleted evidence from his social media and phone. However, Riddle was in the Capitol building for a shorter length of time (about 14 minutes); he did not enter the Senate Gallery or any other such sensitive space; and most important, he was dealing with mental health and substance abuse issues not present in the instant case. Judge Friedrich imposed a sentence of 90 days' imprisonment on the 18 U.S.C. § 641 count; three years of probation on the 40 U.S.C. § 5104(e)(2)(G) count; 60 hours of community service; and mandatory health and alcohol treatment programs. A commensurate period of incarceration is appropriate here.

Finally, in *United States v. Amsini*, 23-cr-423-CJN, defendant Amsini pled guilty to one misdemeanor count of 18 U.S.C. § 641 for stealing an escape hood device from the Senate Gallery. Like Matulich, Amsini entered the building through the Senate Wing Door shortly after the initial breach (at 2:18 p.m.); he entered and remained in the Senate Gallery not long after Senators and the Vice President had been evacuated from the Senate Chamber; he stole government property; and he remained inside the Capitol building for a meaningful length of time (48 minutes). Amsini also posted a selfie from the Senate Gallery on social media with text stating that "the police evacuated senators before we got to the top floor" and he and fellow rioters were trying to subject senators to "citizen arrest cause the justice courts have failed us." Unlike Matulich, however, Amsini told FBI after his arrest that he did not understand what he had stolen from the Senate Gallery and that he threw the escape hood—which he had taken because he saw other rioters taking stuff—away after leaving the Capitol grounds. Matulich, in contrast, stole and kept a symbolically significant American flag, and he told FBI he intended it to be a memento of his time in the Capitol, which evinces a clear lack of remorse. Judge Nichols sentenced Amsini to 45 days' incarceration

followed by 12 months of supervised release, $749 in restitution, and a $25 special assessment. A slightly longer term of incarceration is appropriate here given the nature of Matulich's theft of government property.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Matulich must pay $500 in restitution, which reflects in part the role Matulich played in the riot on January 6.[7] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Matulich's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See id.*

### VII.   Fine

The defendant's conviction for violation of 18 U.S.C. § 641 subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay. *See* PSR ¶ 96 ("Based on the financial information provided by the defendant, and in consideration of his restitution obligation, it appears that he has the ability to pay a small fine in this matter."). Thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200-9,500 (assuming the final offense level is 2). U.S.S.G. § 5E1.2(c).

## VIII.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 3 months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Matulich's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Isia Jasiewicz*
Monika (Isia) Jasiewicz
Assistant United States Attorney
DC Bar No. 102491
601 D Street NW
Washington, DC 20530
202-714-6446
isia.jasiewicz@usdoj.gov